UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| JEFFERY WAYNE HAMMONTREE, | } | Case No. 09-42677-JJR-7 |
| | } | |
| Debtor. | } | |

| | | |
|---|---|---|
| COMMUNITY CREDIT UNION; | } | |
| ROBINSON PROPERTY GROUP; | } | |
| BL DEVELOPMENT CORP.; | } | |
| GRAND CASINOS OF MISSISSIPPI, INC.; | } | |
| GRAND CASINOS OF MISSISSIPPI, LLC; | } | |
| and HARRAH'S NEW ORLEANS | } | |
| MANAGEMENT CO., | } | Adv. P. Nos .09-40119-JJR |
| | } | 09-40120-JJR |
| Plaintiffs, | } | 09-40121-JJR |
| | } | 09-40122-JJR |
| v. | } | 09-40123-JJR |
| | } | 09-40124-JJR |
| JEFFERY WAYNE HAMMONTREE, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

On September 10, 2009, the defendant in these adversary proceedings, Jeffery Wayne Hammontree ("Debtor" and "Defendant"), filed for relief under chapter 7 of the Bankruptcy Code.[1] With the exception of Community Credit Union ("CCU"), the plaintiffs are casino gambling establishments (the "Casino-Plaintiffs" and together with CCU, the "Plaintiffs"). Each of the Plaintiffs filed adversary proceedings claiming the Debtor should be denied a discharge under § 727(a). In light of the common questions of law and fact, these adversary proceedings were

---

[1] 11 U.S.C. § 101 *et seq*, and herein referred to as the "Bankruptcy Code" or "Code." Unless the context indicates otherwise, sections, and other subdivisions of the Code are denoted by the symbol "§."

consolidated for trial. Based on the preponderance of the credible evidence presented at trial, the Court finds that the Debtor should be denied a discharge pursuant to §§ 727(a)(2)(A), (3) and (5).

This Court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. These are core proceedings under 28 U.S.C. § 157(b)(2); therefore, the Court has authority to enter final orders. In compliance with Rule 7052(a) of the Federal Rules of Bankruptcy Procedure, the following shall constitute the Court's findings of fact and conclusions of law.

Although the Plaintiffs alleged the Debtor is not entitled to receive a discharge based on various paragraphs of § 727(a), the Court found that paragraphs (2)(A), (3) and (5) were most applicable to the facts in this case.[2] Those paragraphs read as follows:

---

[2]The Court agrees with the Plaintiffs that the Debtor should also be denied a discharge under § 727(a)(4)(A) because of his inaccurate and incomplete bankruptcy schedules, which were signed under penalty of perjury.
    The Plaintiffs also claimed their respective debts should be excepted from discharge pursuant to § 523(a); however, no determination was made by the Court regarding whether any or all of the debts owing to the Plaintiffs should be excepted from discharge under § 523(a). Because the Debtor is being denied an overall discharge under §§ 727(a)(2)(A), (3) and (5), specifically carving out those debts and excepting them from discharge—assuming they should be excepted under § 523(a)—would be meaningless since there will be no discharge granted from which specific debts may be excepted.
    Creditor, Scotty D. Hill ("Hill"), also commenced an adversary proceeding against the Debtor seeking a determination that a debt owing to him by the Debtor as evidenced by a default judgment should be excepted from discharge under § 523(a)(6). According to Hill's allegations in his adversary complaint, "the Debtor committed an assault and battery upon" Hill. Attached to Hill's complaint was a copy of an Order entered by the Etowah County, Alabama Circuit Court that "determined that the Defendant committed a willful, wanton and intentional act upon" Hill. The Circuit Court awarded Hill damages in the amount of $24,682.39 for medical expenses, $175,000 compensatory damages for pain and suffering, mental anguish and loss of income, and $100,000 punitive damages, for a total judgment of $299,682.39. Doc. 1 filed October 6, 2009 in *Hill v. Hamnontree (In re Hammontree)*, Case No. 09-42677-JJR7, A.P. No. 09-40095-JJR (Bankr. N.D. Ala.). Hill and the Debtor agreed that Hill's adversary proceeding should be stayed

> (a) The court shall grant [an individual] debtor a discharge, *unless* . . .
>
>> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>>
>>> (A) property of the debtor, within one year before the date of the filing of the petition; . . .
>>
>> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case; . . .
>>
>> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . .

<u>Failure to Keep and Preserve Records—§ 727(a)(3)</u>

In this case the most obvious grounds for denial of discharge, and thus the first to be discussed, fall under § 727(a)(3). "The purpose of § 727(a)(3) is to make certain that the creditors and the trustee are given sufficient information to understand the debtor's financial condition." *Meininger v. Khanani (In re Khanani)*, 374 B.R. 878, 886 (Bankr. M.D. Fla. 2005) (citing *6 Collier on Bankruptcy* ¶ 727.03[3][a], at 727-31 (15th ed. rev. 2004)). If the debtor cannot produce sufficient information he carries the burden of persuasion to explain why he has failed to keep adequate records, and his explanation must "convince the Court of good faith and businesslike conduct." *Khanani*, 374 B.R. at 887.

---

until the Court determined whether the Debtor would be denied an overall discharge under § 727(a). Because the Debtor is being denied a discharge under § 727(a) there will be no reason to determine whether the debt owing to Hill should be excepted under § 523(a)(6).

3

Prior to April 2008, the Debtor was the controlling shareholder and the president of JenTree, Inc., a closely held S-corporation.[3] JenTree installed medical equipment and constructed medical facilities at locations throughout the United States. Its largest customer, for whom it had done business since at least 1998, was GE Healthcare ("GEH"), an affiliate or division of General Electric Company.[4]

During 2005 JenTree had no less than 30, and reported gross receipts on its 2005, 2006 and 2007 Federal tax returns of $7,568,614, $11,485,021 and $7,747,642, respectively.[5] The Debtor received substantial remunerations from JenTree in the form of salary, expense reimbursements, and most significantly loans. Tax returns disclosed shareholder loans advanced during 2005, 2006 and 2007 of $403,575, $273,774 and $463,292, respectively. According to JenTree's 2007 balance sheet, the last available, unpaid shareholder loans at the end of 2007 totaled $1,164,903—all but $16,357

---

[3]Although the evidence was less than clear, apparently the Debtor initially owned 50% of the stock in JenTree when it first was incorporated in 1997. Later, the Debtor acquired the remaining 50% and, at least for awhile, became the sole stockholder. In 2004 David Gregerson invested in JenTree and apparently became a shareholder, although it was unclear how many shares he acquired. When JenTree's assets and operations were sold in 2008 (discussed below) Gregerson and the Debtor jointly signed bills of sale on behalf of JenTree. In any event, whatever the stock ownership might have been, the evidence clearly showed that JenTree was under the control of the Debtor and his alter ego. For example, on a "Casino Credit Application" dated January 3, 2005, the Debtor listed his position with JenTree as "Owner." Creditors' Exhibit 3.

Although it is now dormant, JenTree was never dissolved, and the Debtor continued to own stock in JenTree at the time he filed his petition; that stock was not listed on his Schedule B. The fact that the Debtor conducted business through JenTree was, however, disclosed in his Statement of Financial Affairs.

[4]Creditors' Exhibit 15 is a JenTree accounts receivable log dated May 3, 2006. It lists job locations in at least 17 different states; the majority of those jobs were for GEH.

[5]Defendant's Exhibits 6, 7, 8.

4

of which was owing by the Debtor and World Gym, his defunct affiliate.[6] No records were maintained to explain how the proceeds from shareholder and affiliate loans were used. In fact, the Debtor could not produce meaningful financial and business records for himself, his affiliate, or JenTree for the years 2008 or 2009, and neither the Debtor nor JenTree filed tax returns for those years.[7]

The Debtor's financial difficulties became acute in 2007 due to his unmanageable casino gambling debt.[8] Before then the Debtor had acquired and enjoyed a 4,500 square foot house, a 24-foot boat, a motor home, three or four motorcycles (one costing $137,000), a 4-wheeler ATV, and two country club memberships, one provided by a gambling casino.[9] The Debtor was a high-stakes gambler, and owed at least $975,000 in gambling IOU's to the five Casino-Plaintiffs. At least ten

---

[6] Creditors' Exhibit 12A. The Debtor testified that he did not have financial records pertaining to World Gym.

[7] The Debtor produced his personal bank statements from Superior Bank for September 9, 2007 through January 8, 2009, and from Regions Bank for September 23, 2008 through January 6, 2010. He also produced JenTree's statements from Superior Bank for September 4, 2007 through March 2, 2008. Defendant's Exhibit 10; Creditors' Exhibits 13, 14. The Debtor received his 2008 W-2 from JenTree during the trial. Defendant's Exhibit 23.
Code § 521(e)(2)(A) requires an individual debtor to provide to the trustee not later than 7 days before the first meeting of creditors a copy of his Federal income tax return for the most recent tax year ending immediately before the commencement of the case and for which a return was filed.

[8] The Debtor testified that JenTree's struggles began in 2005, although JenTree's tax return for that year reported ordinary income, after deductions, of $451,199. The tax return for 2006 reported ordinary income had increased to $580,412 even after deducting $466,747 compensation of officers. JenTree's tax return for 2007 reported a loss of $639,669. Defendant's Exhibits 6,7,8.

[9] On September 9, 2008 the Debtor sold his Chopper and Harley motorcycles and trailer, motor home (Allegro Bus), and boat for a total of $127,000.00. Defendant's Exhibit 20. The Debtor testified that the sale proceeds were used to pay bills and mortgage payments. The Debtor also testified that he sold a piano for between $3,000 and $4,000.

5

creditors, including the Plaintiffs, have reduced their claims against the Debtor to judgments totaling almost $1.9 million, and the Internal Revenue Service has recorded a tax lien against the Debtor for $113,411.39.[10]

The Debtor offered no plausible explanation for not producing complete and current financial and business records, other than his uncollaborated testimony that these records were kept at his home and were thrown out by his wife following a domestic dispute.[11] He made no effort to explain why records were kept at his home rather than at his and JenTree's place of business or with accounting professionals, or maintained electronically. The most basic bookkeeping system for tax returns, and employees' FICA reporting, require financial information to be furnished to accounting and tax professionals on a regular and periodic basis. JenTree's business and financial transactions were intricately intertwined with those of the Debtor,[12] and if accurate records were being maintained, they would have been substantial. Even if the Debtor's testimony is to be believed, casually maintaining such important and necessary records at home without the means to reproduce them was grossly irresponsible, and their loss under such circumstances does not justify the Debtor's failure to preserve records for the purposes of § 727(a)(3).

Nor may the Debtor be excused from producing adequate records because they pertain to

---

[10] Creditors' Exhibit 21.

[11] The Debtor was twice divorced. Defendant's Exhibits 18, 19.

[12] For example, Creditors' Exhibits 23, 24 and 26 are statements showing charges made on an American Express account in the *joint* names of the Debtor and JenTree. Most charges appear to be personal and not business related: e.g. Sacks Fifth Avenue $1,665.52 for shoes and $1,558.70 for Dior bags; Grier Jewelers $9,500.00, $3,161.00 and $5,900.00; Camping World $3,400.00; Court Street Furniture $6,670.22, $10,000.00 and $12,500.00; American Airlines $8,438.76 for four tickets from Birmingham to Honolulu; Oden Music Company $6,000.00; Gaylord Opryland Hotel $13,696.21 and $5,674.67.

6

JenTree, a non-debtor. In *Nisselson v. Wolfson (In re Wolfson)*, the debtor admitted to having been involved with multiple corporations. In addition to personal records, the plaintiffs in the adversary proceeding sought production of documents relating to the debtor's ownership of various companies. The debtor could not produce such business records, and in explanation of his failure to do so, blamed "memory loss, immateriality of the transactions, theft by his spouse (one of the plaintiffs), and loss of records by the Trustee." *Wolfson*, 139 B.R. 279, 286 (Bankr. S.D.N.Y. 1992). The court recognized that in considering the debtor's explanation of his failure to keep business records, "the '[d]ebtor's education, the sophistication of the [d]ebtor's business, the size and complexity of the [d]ebtor's business, the [d]ebtor's financial structure, and any special circumstances that may exist'" are factors to be taken into account. *Id.* at 287 (quoting *Singer Sewing Co. v. Harmon (In re Harmon)*, No. 91-10288-B, 1992 WL 13624, at *5, *13 (Bankr. W.D. Tenn. Jan. 10, 1992)). Because the debtor was a "sophisticated business man" the court concluded upon consideration of the factors that the debtor's discharge should be denied under Section 727(a)(3). *Wolfson*, 139 B.R. at 287.

In the case before this Court, the Debtor's personal records are meaningless unless produced along side those of JenTree's, his financial alter ego. JenTree was a S-corporation whose income and losses were passed-through to its shareholders, including the Debtor. Moreover, the Debtor treated JenTree as his private bank, and the sparse personal records produced by the Debtor (i.e. personal bank statements) do little to sufficiently disclose his true financial condition, disposition of assets, use of loan proceeds, and business and financial transactions.

JenTree's financial condition and business transactions for 2007 and earlier were sufficiently

7

recorded and preserved.[13] But after 2007 there was a dearth of meaningful records. Particularly glaring was the absence of records disclosing JenTree's financial condition and transactions, and tax returns (including the Debtor's returns), for the years 2008 and 2009. Those two years were significant—the Debtor orchestrated a sale of JenTree's business in 2008 (discussed below), and he filed his bankruptcy case during 2009. Failure to produce records and tax returns for those critical years left the Debtor far short of satisfying the requirements imposed by § 727(a)(3) for discharge. Despite his gambling losses, the Debtor was a sophisticated—albeit self-taught—and aggressive businessman. An individual, such as the Debtor, who had a prepetition business with substantial sales, collections and disbursements, and who conducted that business through a closely-held corporation or the like—e.g., partnership, limited liability company—is obligated to furnish the trustee and creditors with an accurate, documented accounting of that business, and its assets and transactions, and a casual indifference to that obligation, or dubious explanation why records cannot be produced, is not an acceptable justification under § 727(a)(3). Simply stated in § 727(a)(3) jargon, the Debtor failed to keep and preserve recorded information from which his financial condition and business transactions might be ascertained, and the circumstances in this case do not justify his failure to produce such information.

Transferred and Concealed Property—§ 727(a)(2)(A)

In April 2008—when the Debtor's financial demise appeared imminent—the Debtor and William Judson Dawson (a/k/a Judd Dawson) traveled to Wisconsin to meet with JenTree's largest customer, GEH. The month before the meeting, Dawson had formed a corporation called Medical

---

[13]Creditors' Exhibit 16 included JenTree's comprehensive and detailed balance sheets, and profit and loss statements for 2005, '06 and '07, which were obviously prepared by an accountant.

8

Equipment Installation, Inc. ("MEI").[14] Neither Dawson nor MEI had a previous relationship with GEH, and neither had experience in the medical equipment installation business. Nonetheless, following the April meeting, GEH signed a Purchase Agreement for Mechanical Installation Services with MEI,[15] and the work previously performed by JenTree for GEH was given to MEI. Also after the meeting, MEI purchased JenTree's furniture, vehicles, and equipment for $37,717.65.[16] JenTree's accounts receivable and cash were not assigned to MEI.[17]

Immediately MEI took over the leased premises formerly occupied by JenTree,[18] and the Debtor and approximately 30 other JenTree employees became employees of MEI. The Debtor described his new position with MEI as its "operations manager" and offered a nonspecific description of his responsibilities: scheduling manpower, dealing with employees and problems at

---

[14] Creditors' Exhibit 17, pp. 2-3.

[15] Creditors' Exhibit 20.

[16] Creditors' Exhibit 18, pp. 1-10. JenTree's year-end 2007 balance sheet listed fixed assets before depreciation of $1,450,644.14. After allowing for depreciated they were valued at $242,488.72. Creditors' Exhibit 12A.

[17] JenTree's "business" was transferred to MEI in April 2008, and other than three bills of sale, which were one page each, excluding exhibits and notary acknowledgments, no other documents or records were produced pertaining to the MEI transaction.
JenTree's year-end 2007 balance sheet listed cash of $33,412.30 ($69,312.03 total deposited in CCU, plus $200.00 petty cash, less a $36,124.88 overdraft at Superior Bank), and accounts receivable totaling $750,639.23. Creditors' Exhibit 12A. JenTree's 2007 Federal tax return reported cash at year-end of $58,620. The 2007 return listed total receivables and trade notes of $1,642,659 for the beginning of the year, and $654,310 at the end of the year. Without explanation, those receivables were completely cancelled-out by allowances for bad debts. Defendant's Exhibit 8.

[18] Creditors' Exhibit 18, pp. 13-18. MEI's lease of the premises formerly occupied by JenTree is dated April 18, 2008, the same day as the three bills of sale. The lessor under the lease was David Gregerson, a former shareholder of JenTree. Note 3, *supra*.

9

job sites. He is paid an annual salary of $250,000 and MEI initially furnished him with a leased S-Class Mercedes which was later surrendered. The Debtor is shown at the top of MEI's in-house schedule of employees' phone extensions and email addresses,[19] but no phone extension or email address is listed for Dawson, MEI's president.[20] According to the Debtor's testimony, Dawson visits MEI's office periodically, perhaps twice a week, but maintains an office elsewhere. MEI's published website touts the experience of its employees since 1997—five years before MEI was formed—and quotes a customer as saying "I have found Jeff and his staff to be extremely professional . . ."—obvious references to the Debtor and JenTree's former employees; Dawson is not mentioned.[21]

According to the Debtor's testimony, MEI is profitable—a revelation that was not surprising, and is of no little significance. Recall that during the years 2005, '06, and '07, the last three years tax returns were filed for JenTree, it produced revenues of $26,801,277. Profits *plus* compensation of officers during these three years totaled $1,311,609, even after deducting the $639,669 loss reported for 2007. In light of JenTree's documented financial history before the transfer to MEI in April 2008, the three, one-page bills of sale that recited an aggregate purchase price of $37,717.65 for fixed assets, without more, were insufficient to substantiate that adequate consideration was paid by MEI for JenTree's business—a business that was the Debtor's principal asset and source of

---

[19]Creditors' Exhibit 18A. The Debtor testified that he did not know the origin of the schedule, but he did not deny the accuracy of its content. It was not plausible that such a schedule was fabricated or that its origin was other than from MEI. What was unknown was whether the schedule was distributed to MEI customers, used in-house, or both. Regardless, it was significant that the Debtor appears at the top of the schedule and no mention was made of Dawson in any capacity.

[20]Dawson signed MEI's lease as its president.

[21]Creditors' Exhibit 17, pp. 3-5.

10

Case 09-42677-JJR7    Doc 63    Filed 03/11/11    Entered 03/11/11 16:09:56    Desc Main
Document      Page 10 of 15

income before he sought bankruptcy relief.

Accordingly, based on evidence presented at trial, and without the benefit of documentation to prove otherwise, the Court finds that the Debtor caused JenTree's on-going business, customer goodwill, operating assets and business location, as well as its employees' expertise and locality, to be transferred to MEI for his own personal gain that was realized in the form of a substantial on-going salary and use of an expensive automobile. The Debtor's and JenTree's failure to maintain records made it impossible to place any estimated value on what was transferred to MEI. Under the facts in this case, the Court must conclude that the transfer was a thinly veiled attempt to avoid exposing the Debtor's equity in JenTree to the claims of his creditors. In lieu of taking an equity interest in MEI or other above-board and salient form of consideration that could be administered in bankruptcy, the Debtor negotiated for himself a substantial on-going salary (and initially at least, the use of an expensive automobile) that he anticipated would survive bankruptcy intact.

The ruling in *Coady v. D.A.N. Joint Venture III, LP (In re Coady)*, 588 F.3d 1312 (11th Cir. 2009) has particular application to the facts in this case. Before filing for bankruptcy relief, Coady had been a successful real estate developer but an economic downturn left him with debts that far exceeded his net worth. The debtor married, moved into his wife's house, drove a car leased in her name, and worked exclusively as an "uncompensated independent contractor" for business entities owned by her. He was allowed to write checks in his wife's name to pay personal expenses, and she paid for his country club and golf memberships which he used to promote a consulting and marketing business she owned. After Coady filed bankruptcy, a judgment creditor filed an adversary proceeding asking the bankruptcy court to deny Coady a discharge under § 727(a)(2)(A). The bankruptcy court "found that Coady had, with the intent to shield assets from his creditors, diverted

11

the fruits of his labor to increase the value of his wife's businesses and then used business assets to support his personal lifestyle." 588 F.3d at 1315. The bankruptcy court entered a judgment denying the debtor's discharge on the grounds that he had concealed an equitable interest in his wife's business. The district court affirmed, and on further appeal the Eleventh Circuit affirmed both lower courts holding that "[t]hrough this arrangement Coady acquired and concealed an equitable interest in his wife's businesses." *Id*. at 1316. "Significantly, § 727(a)(2) does not require a transfer at all; on the contrary, it refers to the transfer *or* concealment of assets, and 'the atypical structure of the concealment alleged here is not reason alone to absolve the Debtor of concealment in the one-year pre-petition period.'" *Id*. (quoting *In re Ogalin*, 303 B.R. 552, 558 (Bankr. D. Conn. 2004) (emphasis in original). Finally, the circuit court found that Coady's concealment of assets was continuing thereby allowing the creditor to avoid the one-year look-back period. "To allow a debtor to reap the rewards of his continuing efforts to evade creditors because they learned before the look-back period of the property on which they could not levy execution would rob the continuing concealment doctrine of its force." *Id*.

Although the facts in the instant case are more subtle than those in *Coady*, the same principle applies. Historically, JenTree had proven it was capable of generating substantial revenues and was capable of handsomely compensating its officers and stockholders through salaries, loans and expense reimbursements. Under the burden of the Debtor's financial mismanagement—in particular his pillage of the corporate treasury disguised as shareholder and affiliate loans—it is understandable why JenTree was not profitable during its final months of operation. But after the transfer and sale to MEI, the same business model employed by the same personnel, including the Debtor, once again became a profitable venture—the only apparent change being the segregation of the Debtor's

12

personal finances from legitimate business.

In light of JenTree's proven ability to produce substantial revenues, the consideration paid by MEI for JenTree's business—which in actuality included not only fixed assets but also goodwill, customer relationships, operations, employees and management expertise, leased premises, and on-going sales—was grossly inadequate.[22] Regardless of the dearth of records, we do know that as a result of the transfer to MEI, the value of the Debtor's equity in JenTree was rendered worthless, and immediately following the transfer the Debtor began receiving, and continues to receive, a substantial salary that would be kept beyond the reach of creditors if a discharge were granted in this case. Without adequate records, the Court must assume the worst: That the Debtor's equity in JenTree was converted to a concealed equitable interest in MEI, and that equity is paying dividends disguised as salary and benefits. It is reasonable to anticipate that MEI's profits, and the Debtor's salary, will continue as long as the Debtor manages MEI's operations (but not finances). And the likelihood that those profits will end if the Debtor should leave MEI's employment is an eventuality that would not go unnoticed by Dawson—an eventuality that virtually guarantees the Debtor's continued employment and salary until a more formal equity stake can be formalized were the Debtor to receive a discharge in this case.[23]

---

[22]What was missing was any attempt to value JenTree's business by capitalizing its income.

[23]In other words, the Debtor has a "call" on MEI's most important asset and source of revenue: the Debtor's relationship with JenTree's former customers, including GEH—a relationship that has proven to be both profitable and portable.

13

Failure to Explain Deficiency of Assets—§ 727(a)(5)

A denial of discharge in this case under § 727(a)(5) is again predicated on the lack of adequate records for the Debtor and JenTree. Without such records the Debtor has not and cannot "explain satisfactorily, any . . . deficiency of assets to meet the debtor's liabilities." *Id.*

Conclusion

"'The Bankruptcy Code favors discharge,' but '[t]he general policy that provisions denying such a discharge are construed liberally in favor of the debtor and strictly against the creditor applies only to the honest debtor.'" *Coady*, 588 F.3d at 1315 (quoting *Jennings v. Maxfield (In re Jennings),* 533 F.3d 1333, 1338-39 (11th Cir. 2008)). In this case, the Debtor has left the Court with no choice but to deny him the preferred status of a honest debtor. Until 2008, the Debtor enjoyed a comfortable, if not lavish lifestyle and he showed little aversion to financial risk, including gambling with large sums of borrowed money; nonetheless, those were his personal choices and did not make him dishonest when considering whether he was entitled to a discharge. Aggressive business men and women, and skilled (and lucky) gamblers can be highly successful, but when they fail financially and seek bankruptcy relief, they must provide sufficient records that accurately reflect current and historical financial conditions and transactions for themselves and their businesses—especially closely held businesses. Those records may demonstrate a debtor's financial failings were due to a bad economy, poor but honest choices, or simply bad luck—but for certain, adequate business records are required under § 727(a)(3) for debtors who conducted prepetition businesses if they expect to be granted a discharge. A debtor cannot expect creditors or the court to independently determine his financial condition, or chart his business and financial transactions. Neither creditors nor the court are required to conduct a postpetiton audit of a debtor's and his business's bank

14

accounts, tax returns, W-2's, 1099's and similar records, or evaluate contracts, transfers and other transactions, as a substitute for the debtor's obligation under § 727(a)(3) to maintain and preserve financial and business records. In this case, even if the Debtor's creditors or the Court were willing to conduct such an audit and evaluation, without the missing records and tax returns for the years 2008, 2009 and beyond, they would be stymied in their attempt to make a meaningful determination of the Debtor's financial condition as of the petition date and for the preceding several months. Likewise, the lack of records leaves in doubt the Debtor's financial and business dealings pertaining to JenTree, especially his less than transparent pact with MEI and the undetermined value of Jentree's business transferred to MEI. If the Debtor had produced comprehensive records and tax returns for the time frames in question, the Court may have reached an entirely different conclusion. Simply stated, too much value, including loan proceeds and business assets—especially assets ostensibly owned by JenTree but under the Debtor's control—were left unaccounted for. Moreover, the Court has concluded that the Debtor's transfer of JenTree's fixed assets, leased premises, goodwill and on-going operations to MEI was an attempt to convert his interest in JenTree into equity in MEI, concealed as salary and benefits.

Based on the evidence presented at trial, and for the reasons stated above, the Court concludes that the Debtor should not be granted a discharge in this case. An order will be entered in conformity with this opinion.

Dated: March 11, 2011

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge

15

Case 09-42677-JJR7    Doc 63    Filed 03/11/11    Entered 03/11/11 16:09:56    Desc Main
Document      Page 15 of 15